NRA Energy Futures Holding Corp. No. 16-1351, 1926, 1927, and 1928. And we have Mr. Anka and Mr. Horowitz on one side, and Mr. McGann on the other. This is a simple case, right, compared to the other one, right? I promise not to use the Walker process fraud term. Stay away from claim in theory, too, while you're at it. I will stay away from all of that. May it please the Court, I'd like to reserve three minutes for rebuttal if I might. The fundamental question here is whether EFIH's first lien note holders are entitled to a claim in EFIH's bankruptcy, a claim that would be paid in accordance with standard procedures, rules of distribution, and bankruptcy. Are they entitled to a claim for the full amount they are owed under their contract in state law, or whether they can be denied that claim by EFIH simply because EFIH filed for bankruptcy and for the benefit of EFIH's shareholder. The Bankruptcy Court acknowledged that had EFIH done exactly what it did, but not in bankruptcy, had it redeemed the notes on June 19, 2014, it would owe a make-all. And it also held that because of the bankruptcy, the debt accelerated, and therefore the option... You knew they were considering this back on November 1st of 13, right? Correct. This whole agreement was negotiated and entered into really in the shadow of an impending bankruptcy? No, Judge Smith. The underlying indenture dates back to 2010, and it actually had many predecessors. So the answer to that question is no. But the answer to Judge Ambrose's question is absolutely yes. There was an 8K filing in November indicating they would intend the file, and they would not redeem at that point. They would wait until the bankruptcy. So it sounded like what they were trying to get at that point in time was leverage. I think that's a fair way to put it, and frankly the agreement, Judge Ambrose, that led to the decision to not redeem then was an agreement with junior parties and constituencies, including the ultimate equity holders and the parent shareholder, EFH. Help me with something, Mr. Edgar, and since you have referred to what the bankruptcy court did here, the bankruptcy court also relied upon the Northwestern case. It's only a trial court decision in New York. What clearly sets forth the proposition that a prepayment premium will not be enforced under default circumstances in the absence of a clause which so states, does the bankruptcy court seek to have Northwestern bear more weight than it really can? Yes, both as a matter of law, Judge Smith, and as a matter of fact. As a matter of law, it is a lower trial court decision in New York. The Supreme Court is the lowest court. But more importantly, I submit, as a factual distinction, I submit words matter. Our indenture provided that we are entitled to a make call if EFH chooses to redeem, not prepay, redeem, not before maturity, whether the maturity is accelerated or otherwise. Is your understanding of redeem payment either at maturity or before maturity, but your understanding of prepayment is a payment before maturity only? Precisely. Is that correct? I mean, Judge Amber, there is scholarly debate. If you look at the Law Review article written by Scott Charles and Emil Kleinhaus, they debate whether prepay, the pre-clause, should be termed to mean pre-stated maturity rather than pre-accelerated maturity. But I would concede that courts have read it to mean pre-accelerated maturity. Every court to consider the question of what redeem means, including the Second Circuit in Chesapeake, has said it means a payment whether at, before, or after maturity. It simply means a repayment. But usually in the modern world, which I once was in, a redemption is according to Black's Dictionary. It usually is a payment before maturity. In other words, if interest rates have dropped and the utility wishes to get out of here, get a lower rate, and therefore they redeem the bonds. But the term can mean before, and it can also mean as in all the authorities we cited, at maturity. And here there is no definition in the contract itself, so you have to use the common parlance. And if it only meant payment before, then you'd see the term prepay, which appears in numerous other indentures, but doesn't appear here with the word redeem. And it's underscored by saying redeem before December 1, 2015. Not redeem before the earlier of accelerated maturity or December 1, 2015. So is your argument essentially that you look to the literal text of what's in the indenture here? It is certainly my view with respect to this argument, the contract argument. Judge Ambrose, I do not take issue, and I will get to this in a moment, with the notion that a contract has to be understood against the backdrop of applicable law. I am not asking you to take the bankruptcy code and shove it all aside. Which brings me to the next point. Well, let me just back up. The court in Momentum and the court here, for the most part, focused on Section 6.02. Section 6.02, which deals with acceleration upon default, in this case the filing of the Chapter 11, is that related to 3.07, which is the reduction provision, or is it unrelated? They're independent provisions that are consistent, and they deal with different issues. How are they consistent? Help me understand. Sure. Because 6.02 answers the question, Judge Smith, what is the consequence of a default? And what it says in 6.02 is the notes come due. And if you look at the notes, what the notes say is principal comes due, interest comes due, and if there's a redemption, if there's a redemption, then the make-all is due. And so the answer to your question is... Right. But the first thing to know about 6.02 doesn't really talk too much about the premium, does it? It says the notes are due, Judge Ambrose, and the notes have the very same provision for a make-all. That is in 3.07. In 6.02, though, a more specific provision specifically refers to default. One of the default provisions is bankruptcy. No, Judge Fischer, it's more specific in defining what the consequence of default is. But you have to step back and ask the question, why did we get paid in June of 2014? We didn't get paid in June 2014 because there had been a default and an acceleration. No one else in this case has been paid, even though they all had the very same acceleration language, including the vast bulk of the second lien debt. We got paid because EFIH decided to redeem us. It made a choice. It issued an 8K when it came to the second lien debt, and it said, we have the choice but not the obligation to redeem. That was after the debt accelerated by reason of bankruptcy. So my answer to your question, Judge Fischer, is 6.02 tells you what the consequence of a default is. We're not claiming that default, which is that the notes come due, which means that the principal comes due, interest comes due as a matter of contract, but none of that is enforceable because of the bankruptcy code. And if later they redeem us, then 6.02 also says... What you are saying, which I think would be different than what your co-counsel for the second lien note holders are saying, is that 6.02 and 3.07 are independent. He's likely to say that, no, they dovetail together. Well, I think they are consistent, Judge Ambrose. They are independent because they address different issues, but I think I get to the same result on 6.02. The point here is... At least something similar to the language that the second lien note holders have. No, Judge Ambrose, because our language, 6.02 in our case says the notes come due, and the notes themselves contain the same exact redemption provision. But, Judge Ambrose, let me move, if I could. Let me just answer Judge Fischer's question, and if I can, move to another issue. I think, Judge Fischer, you're putting your finger on the critical issue. Ask yourself the question, why was my client paid in June 2014? If it was paid in June 2014 because the debtor was obligated to, there was a default, and it had to pay us that day, then 6.02 may be the right section to look at. But if that's right, why did none of the 42 other billion dollars in debt in this case, all of which have the same acceleration, I say in this case, I mean the whole EFH, not just our debtor, why did none get paid? All of the debt, the reason we got paid is the EFH made an election to redeem us, and it did so because interest rates went down, and that's exactly what the make whole is designed to address. If I can, let me move to the second issue because I think it's also critical here. There is no dispute whatsoever. Let me hold you right there a second. Under the indenture, though, under 6.02, didn't they have to pay you? No, Judge Fischer, two reasons I say no to that. First is under the indenture, if you want to look at the indenture with blinders to the bankruptcy code, we had the ability to rescind acceleration, and we sought to do so. Let's step back and use common sense here. Were we standing up and demanding payment? Were we saying we must be paid today? Absolutely not. We were saying the opposite. We were saying we're happy to have the debt be reinstated. We waive the default. We waive the acceleration. Second, Judge Fischer, I come back and I will acknowledge, I think you need to read a contract, in this case the indenture, against the backdrop of applicable law. And here applicable law is the bankruptcy code, and the automatic stay, sin qua non, is that it says that a debtor doesn't have to pay debt simply because of a contractual acceleration. The automatic stay protects the debtor at 11.24, says the debtor can reinstate notwithstanding any default. So both because you read into the contract the law, and independently they were not obligated. Let me move to that issue if I could. The bankruptcy court agreed, and if you look at paragraph 69 of its summary judgment order, it's quite clear that we had a contractual right to rescind acceleration, and if we could exercise that right, then we would be due the make whole. But it held that the only reason we couldn't do that is because of the automatic stay. That raises the question, and let me pose the question, I think you asked it in an earlier panel, what do we have to decide? Here's what I suggest the legal issue is on this argument. Where a creditor would have a valid claim under state law if it took an action, but that action it cannot take in bankruptcy because of the automatic stay, is the claim allowed in bankruptcy or disallowed? And I submit that the statute tells you the answer to that question is that the claim gets allowed. It is a contingent claim. First, my time is up. No, go ahead. Add three minutes, Gina. Gina, please. First, the automatic stay is procedural, it is not substantive. It prevents us from going and foreclosing on our collateral, suing out of court. But what it never operates to do is to disallow the substantive claim. Section 362 is the stay provision. It says what the stay operates to do, none of which is to disallow a claim. Then look at the claim allowance provision, section 502 of the bankruptcy code. First, it incorporates the term claim, which includes a right to payment even if contingent. That's precisely what we had according to the bankruptcy court, a right to payment contingent on foreclosing. But if that weren't enough, section 502B1 says, the claim shall be allowed unless it is unenforceable as a matter of contract or a perk of the law, and now the key words, for a reason other than that it is contingent. And Judge Ambrose, I think you dealt with this issue head on in the Stefan case, a case that I will admit is non-precedential. It's a mortgage foreclosure, right? It's a case that is not binding on this panel, but I submit you got it right. I'm happy to say that, Judge Ambrose, and I think it is on all fours. In that case, Wells Fargo, as a matter of applicable law, could only have a claim under state law for a deficiency if it foreclosed. The automatic stay barred it from foreclosing, and this court said not that it's entitled to relief from the stay, but rather whether or not it's entitled to relief from the stay, the claim has to be allowed. Imagine that my client had a contract that said we're entitled to get paid if but only if we furnish an invoice with detailed time records. Imagine I was a service provider. Or imagine I had to file a lawsuit. No one would say in bankruptcy, no one would say you get the claim disallowed because you can't satisfy that step. The stay doesn't disallow a claim, and that, I submit, that in this respect, the decision below breaks new law, and it's new law that is contrary to the words of the statute and to this court's decision, and Stefan, and all of this court's published precedent on what contingent claims. Although the bankruptcy court case, as affirmed, is not that different from Momentum, right? In Momentum, you can make the same argument, and the same argument was made. Judge Drain didn't reach it. I will say there is one critical difference, and I've tried to get to it in my 20 seconds left. It goes to really the third and fourth arguments grounds we have for reversal. Momentum was clearly an insolvent debtor. This is a debtor who is presumed to be solvent, and that raises the question, even alternatively, why do we not get a claim for denial of the right to rescind acceleration? That's a contract right we had, and if we were able to exercise it, we'd get the make-all. In Momentum, Judge Drain said, you're absolutely right, but I think what that claim really is is unmatured interest under Section 502b2 of the Bankruptcy Code, and therefore disallowed.  But he said those were solvent debtor cases, and with a solvent debtor, the rule against unmatured interest doesn't apply. That distinction would allow Momentum to stand on its facts and get to a different result here. Finally, on lifting the stake, and I'll only say one word given two words, given my time here. The proposition that the Bankruptcy Court accepted, and it's argued by my adversary, this is page 49 of their brief. In this lift-stake context, the Bankruptcy Court correctly held that harm to equity interests legally a part of the debtor's estate from lifting the stake is just as relevant to harm to creditors. I think the briefs covered that one pretty well. That cannot be the law. I will cede my time, but I do submit that's an issue of law, and there, too, the decisions are fundamentally breaking new ground. Thank you very much, Judge. Thank you. Mr. Horowitz. Thank you, Your Honor. Gregory Horowitz from Kramer 11, Neftalys & Frankville. So are 6.02 and 3.07 related or unrelated in your case? I think that they are. I agree with Mr. Anker, Your Honor, that they are consistent. I think 6.02 describes and provides. Obviously, I'm going to tell you in a minute that I think that our 6.02 language is better and more specific, but provides that in the event of an acceleration. It certainly refers to a premium. It does. It's pretty much the same as what was in Momentum, correct? Well, Momentum did not have the language about any other monetary obligations under the agreement. Also, in Momentum, you did not have the record that we have that this language was specifically negotiated for as an addition to what had previously been a model. To me, the best argument you have that the 8K that was filed post-bankruptcy says that they can go forward, they have the right to redeem, but they don't have to. Yes, Your Honor, absolutely. I think that, as Mr. Anker said, I think that... You have the right to redeem. You don't have to. It's called an optional redemption, which is the caption of 3.07. And when you look at what the debtor did with its debt here in this case, it took one piece of debt, the first lien, paid it off at the outset. It took a lot of debt and has let it ride through. And it took our debt and actually partially redeemed it one year into the bankruptcy, I think, through its actions. The debtor has evidenced the fact. So it is your main argument in this context? Yes, it is, Your Honor. And I agree with Judge Smith. I think the Northwestern Mutual case has been sort of blown out of proportion. Now we have at least four separate federal districts. Yeah, there I thought you would rely more on the actual New York Court of Appeals case, NML versus Argentina. Which states, Your Honor, the proposition that even after acceleration, all other obligations under the indenture remain in place. Correct. So if 6.02 has a problem, 3.07 doesn't. Absolutely, Your Honor. It's very easy for me to stand here and agree with that. I do think that under the plain language of the agreement, regardless of whether there is this purported rule of explicitness, we should win. And I think that if there is a rule of explicitness under the record here, the fact that the language premium, if any, and any other monetary obligations must be given some meaning, we do make use of parole evidence. But frankly, Your Honor, we make use of parole evidence solely for the proposition that some meaning should be accorded to this, that the debtor's own witness admitted at deposition that this was specifically negotiated language that was intended to have some meaning. The debtors have tacitly acknowledged in their briefs that there's no meaning the premium, if any, could have other than the premiums in the indenture. And the debtors have said, well, if you wanted to be explicit, it would have been very easy to use the defined term initial caps applicable premium. We did not do so. I think there's an important point to make here, Your Honor. 3.07B makes reference to the applicable premium being due upon any redemption prior to these specific calendar dates. In this case, with regard to our two series of second lien notes, one of those dates has already passed. And the second date is very likely to pass. It's due to pass on March 1, 2017. The current plan of reorganization is not likely to go effective before that date. We will actually not be in an applicable premium situation except with regard to the partial pay down that was made in March. How much was the pay down? I'm sorry, what's that? How much was the pay down? The debtors paid $750 million, but that was allocated first to accrued pre-petition and post-petition interest and accrued fees. So only about $445 million of that went to pay down principal on what was in excess of $2.1 billion in debt. So that partial pay down in terms of principal amount was a relatively small amount of our debt. Most of it is outstanding. When it is redeemed on the effectiveness of a plan of reorganization, it will be redeemed very likely after what are called the first call dates. We will not be in an applicable premium situation. We will be in a lowercase p premium situation under 3.07d, where the prepayment amount will be 105.5% of principal, in other words, a 5.5% premium. This goes to the point, why was lowercase premium, if any, the more appropriate language to use than an initial caps applicable premium? Because there were two potential premiums that could become due under the indenture. In this case, one became due on the partial pay down, and the other will become due upon the pay down on the effective date. That actually answers my last question. Thank you, Your Honor. One point I wanted to make as a courtesy to the Court, I wanted to advise the Court, as has become public record as of a couple of weeks ago, we are very close, the second lien note holders are very close to a global resolution of issues with regard to the plan, including the May call. We are hoping to finalize it within the next couple of weeks. When and if we do so, we will be sending a letter to the Court asking the Court to stay proceedings, meaning withhold decision on our appeal, understanding, of course, that the first will go forward. And under that contemplated settlement, it would not become actually final and effective until the plan goes effective, at which point we would ask for withdrawal of the appeal with prejudice. All right. Thank you very much. Thank you, Your Honor. May it please the Court, Andrew McGann for the appellees. Maybe I should begin with Judge Smith's question about how Article III, and specifically Section 3.07 and the acceleration provision in 6.02 relate or don't relate to one another. Judge Amber, you were asking much the same question. Our view is that they're harmonious. Language does matter. Words do matter, as Mr. Anker said. They describe different pathways in the indenture, different negotiated pathways agreed to in advance by the parties by which these notes could be repaid. Article III. Well, 6.02 just says it's accelerated, right? Well, it says a little bit. It does say that, and it says a little bit more. It says that upon the- You're going to focus on the first or the second right now? I'm addressing your question with respect to 6.02. Yeah, with regard to the first or the second note? The first lien indenture. Okay. Although they both share this language, so this would apply to both of them. But the acceleration provision in 6.02, Judge Amber, to go to your question, provides that the notes upon, in this instance, a bankruptcy filing by EFIH, which of course occurred, the notes shall be due and payable immediately without further action or notice. So that's what it provides. So upon the bankruptcy filing, April 29, 2014, the maturity dates of the notes by prior agreement were accelerated and became due in a mandatory fashion, In effect, I mean, because I'm looking back to November 1, 2013, we filed the 8K that said that if you filed, you have, in effect, the intent not to pay the make whole premium. So then almost six months later, you file. It's like you're filing put them in jail because there's now an acceleration. You could rescind it, you, under 1124-2. You decide not to. They could rescind it under the language of 6.02, but you say, no, no, you can't, because that's a violation of the stay. They file for declaratory judgment action right around May 15th. The court doesn't decide it, and they also file a rescission notice, and then alternatively, if it needs stay relief, they ask for that. That's on June 4. June 6, the court grants the motion for financing, and two weeks later, it closes on June 19, or less than two weeks later, I guess, or two weeks, yeah. The court doesn't then decide the issue relating to what they asked for for maybe ten months until April of the following year. So it looks as if what happened is, as Mr. Ranker said, you made the choice, certainly as you did with regard to what you said in the 8K concerning the second lien note holders, that you have the option, and you have the right to redeem it, and you have the option to do it, and you did it, both with regard to the first lien note holders and the second lien note holders. A couple things with respect to that scenario, Your Honor. Firstly, with regard to the 8K, what it is announcing is what is obvious from reading both New York law and the bankruptcy decisions that preceded November of 2013, namely that when the lender agrees in advance to automatic acceleration upon a bankruptcy filing, it forfeits its right to a yield maintenance provision or a make whole, the applicable premium in this case. And that is what the Solution Court found back in 2007 in exactly this setting. Automatic acceleration is a voluntary agreement by the lenders to get it up. Solution was for the bankruptcy court in the Southern District, or where? Solution was a bankruptcy court in the Southern District of New York, yes, Your Honor. Right. So the observation in the 8K in advance of the bankruptcy filing was But is there anything, there was nothing in Delaware at that point. Not with respect to this specific issue. No, not that I'm aware of. There is a decision out of the bankruptcy court in Delaware earlier on, which doesn't address this specific issue. It's the In Re Anchor Resolution Corporation. It's a case out of the bankruptcy court in Delaware in 1998. And the reason I mention it is because it quotes verbatim in that decision language out of an indenture that preserves the right to collect a make whole premium after automatic bankruptcy acceleration the right way, the one that conforms with New York law as described in Northwest Mutual. And that indenture, which the bankruptcy court quotes back in 1998, says even after acceleration following an event of default, which was also a bankruptcy filing in the Anchor Resolution Corporation case, quote, a premium equal to the make whole amount, close quote. And make whole amount is a defined term in that indenture, like applicable premium is in this one. So the court there has pointed out the acceleration clause did what this one does not do, which is what many, many courts have said is very easy to do. Bankruptcy courts have said this repeatedly. New York courts have said it. You just be, you are explicit and you're clear in your contract language and do it in the acceleration clause. And refer to the premium that you believe is due. And in that instance, it's enforceable under New York law. What's referred to as a CALPINE 1 decision, decision by Judge Lifton in the bankruptcy court in the Southern District of New York, also back in 2007, is interesting. He was dealing there, and instructed on this point, he was dealing there with a no-call provision. And the repayment had occurred in bankruptcy during the no-call period. And he held that the no-call provision in bankruptcy is void. It's a creature of federal law. You can't enforce it in bankruptcy. He, of course, went on to award an unsecured claim for damages, which the Southern District later reversed. But I want to draw the court's attention to what Judge Lifton said at page 398, footnote 6 of that opinion. It pointed out that other debt held by CALPINE, the debtor, and its affiliates that were in the case before him, quote, specifically required payment of a, quote, make-whole amount, defined term, in an event of default accelerated to the outstanding loan amounts. So there, too, back in 2007, we see reflected in this decision of the Southern District, just as Solution said, can easily be done by the parties. But what you've got here is you've got an indenture governed by New York law. You're relying on some language that's in a New York trial court opinion, followed five years later by a New York Court of Appeals opinion, the highest court, that says that you look at provisions independently outside of acceleration. And in this case, let's go with the first three rules. They're silent in 6.02. You've read the language as to what happens with regards to the make-whole premium. Then you go to 3.07. Why isn't what you did ultimately in June of 2014 an optional redemption, a redemption at your place of choosing, to use a military term? I'll go directly to that question. The language of the indenture answers it. If you go to Section 3 of the indenture, at the outset, this is the redemption provision, at the outset in 3.01, the very first line says, if the issuer elects to redeem the notes pursuant to Section 3.07, not generally, not in the abstract, but specifically pursuant to. So the reason that you're not using that language is because you have to give certain notices. So you're saying that your failure to give those notices excuses you from any kind of consequences with regard to what would be, in practice, an optional redemption under 3.07. That doesn't make any sense. Well, I'll finish the point because I think it does harmonize with a different pathway that 6.02 permits in the case of automatic acceleration. In 3.07e, so we have bookending the notice provisions in 3.01 through 3.06, your Honor refers to, 3.07 then describes the yield maintenance provisions, the make whole. And 3.07e says, to wrap up the point, any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof. And my point, your Honor, is that what the parties negotiated for and agreed to was that if there was going to And no mention of 6.02? None. None. So if the issuer elects to redeem subject to Section 3, it has to. It is mandatory by the agreed language to follow those provisions. That's my point. How can you say my default excuses my compliance? The reason there is there was an agreement, a negotiated agreement, memorialized in the indenture that if there were a Chapter 11 filing, it's in 6.02, it's an event of default, the consequence of that would be to accelerate the maturity date to today, to the petition date, and make the notes due and payable immediately. If you go back to what Mr. Ranker said, which I think makes this case a little different, you didn't have to pay the first note holders at that time because you had protection. You could have sat back and waited and said, yeah, we owe you the principal, we owe you the interest, and you can get paid when the plan is approved, like all the other creditors. But you went out and you refinanced the debt at 4.25%. Isn't that different than just sitting back and waiting and paying in the normal course? It is. This describes different situations. Under Section 3, the optional redemption provisions that provide the only place in the indenture that provides for any yield maintenance or makehold protection, there is a sliding downward scale of premiums that run from the day the notes are issued to the eighth year of the 10-year term. And as you move closer to maturity, the yield protection provisions by agreement go downward, downward, because that's the point. If you pay before maturity, if you elect to pay before maturity, you must pay at the yield protection. And in Article 6, the notes have been fully accelerated. It's an incompatible situation. If you were to pay at maturity under Article 3, there is no way. Let me ask you another question. So what if you exercised your rights under 1124.2 and got rid of the acceleration and then went under 3.0 or did your dip financing? Would things have changed there? If I understand Your Honor's question, if the debtor elected as Section 11. . . To rescind the acceleration. To rescind the acceleration in a plan, as Your Honor knows is required, to do it in the plan, and then emerged and the debt was still in place, and then chose to repay it, and we're outside of bankruptcy, and we're outside of Section 6 automatic acceleration triggered by Chapter 11, then we would go back and look at the optional redemption provisions. Because you would be in advance of maturity and you'd say, well, when? How far in advance? How much yield protection are you entitled to? Because you're in advance of maturity. But when we pay off in bankruptcy after acceleration under 6.02, we're at maturity. And that's what the bankruptcy rewards would help. But 3.07 doesn't use prepayment. It says the word redemption, and it uses a specific date, 12-1-15, for the first loanholders. Right. Section 3.07 is entitled optional redemption, and it defines three different scenarios. The first five years, if you pay five years or more before maturity, you use the applicable premium formula. If you pay in the next three years from five to two years ago. . . It's a sliding scale. If you pay in the last two years before maturity, there is no yield maintenance protection. That's what Section 3 says. But isn't the word redemption technically a choice that you pay either for or at maturity? It is not, Your Honor, because we have to start with the language the parties agreed to. And the parties agreed to what an optional redemption means for purposes of this indenture, and it's set out in 3.07. And there is no make-hold-do, none, by the terms of Section 3. You lost me. At any time prior to 12-1-2015, the issuer may redeem all or part of the notes at a redemption price equal to, blank-blank, plus the applicable premium. So my question is, is there a difference between a redemption and a prepayment? There is not in this case because the optional redemption . . . There is not in this case. Are the words defined? What an optional redemption means in this indenture, what the parties agreed, is set out in 3.07. The entire formula . . . Are the words prepayment in the definitional section, that's prepayment defined? No, it is not. Is redemption defined? No, it is not a capitalized defined term in the definition section. So those needs then have to go by what the, in effect, dictionary meaning of it is? Well, to . . . To be understood in financial sector's definition? Two responses to that. First . . . No, you don't, I would respectfully suggest, because the parties agreed to what an optional redemption means, and they laid it out in the contract. Where did they agree to that? 3.07 . . . Okay, give me the language. Well, 3.07, it's the operation of the . . . Okay, but read me the language that supports your position. I'm referring to the fact that 3.07 is entitled optional redemption . . . But it's only a title. It's only a heading. There's nothing in the nature of definition as to redemption within 3.07. No, and I concede to that point. In the dictionary definition, so to speak, at the point of the indenture . . . So, why . . . I'm not sure I heard you answer Judge Ambrose's question about in the absence of such a definition, aren't we left then, as a court, to look to whether it's dictionary or whether it's an ordinary accepted . . . No. . . . and accepted meaning within the trade of practice? Yeah, it's a fair question. It's a second point that there is no generally accepted meaning. I think one of . . . your Honor pointed out when Mr. Anker was standing here that Black's Law Dictionary, it's the ninth edition from 2009, defines redemption to mean payment before maturity. So, the point of that is, is you cannot find a term of art generally accepted that you can impose upon the intent of these parties. Instead, I would suggest that if we need to understand what these parties meant . . . Hang on, I'm looking at you. It was quoted in Chesapeake Energy. It says, refers to any payment . . . that's the Second Circuit . . . any payment made in satisfaction of a debt, not merely one made before maturity. In other words, not merely a prepayment. And that would seem to be one that perhaps we should adopt. Should we not? The reason that I think it's not a safe course to adopt it is because there are, as we said in our brief, other cases that refer to redemptions in other settings. I could go to the Wayback Machine and go to the Felden v. Kyle from our circuit in 1939. Redemption carries with it the idea of paying back or satisfying the indebtedness. Right. I'm going to say when. And I think the conflict that the Court would run into in trying to impose upon what did the parties mean here is that they negotiated a fairly intricate and detailed scale of yield protection in 3.07. Under no circumstances, under the optional redemption provision as it's called in this indenture, under no circumstances is any due, if you pay at maturity or even within the last two years prior to maturity, none. Why didn't you wait to 12-2, 2015, before you made the takeout of the first clean door holders? I realize there's still something left that they could claim by way of a preemptive, but not nearly as much as the 431 million that existed prior to that time. I'm not following your question. Why did the debtor wait until 12-2, 2015? In other words, the time period had passed to redeem. Oh, why didn't they wait? Why didn't you wait until 17 months and 11 days or whatever the heck it is? There was significant preservation of value available to the debtor. If they could refinance the first lien debt as quickly as possible. You say 13 million a month. Yes, the testimony was and the record reflects about 150 million up through the December 15, 2015 date. So it is, as I know the court understands, not only a typical effort that debtors undertake in cases like this, but one that its creditor body and its constituents, including, yes, its equity holders, expect the creditor to pursue, which is to preserve value. So this optionality, Judge Fischer, that you were asking about, that there could have been a decision whether to reinstate or to wait until later to pay it or wait until the plan at the end of the case, to pay it is a creature of federal law. That is to serve bankruptcy and reorganization interest and not a creature of the party's private agreement here. The optionality to elect a 3.01 to 3.06 notice and early payment prior to maturity is laid out in detail in Article 3. In the case, however, where there is a Chapter 11 filing, which is clearly anticipated by the parties here as a possibility because they have enshrined it in Article 6. They have denominated it as a trigger for automatic acceleration. The lenders agreed in advance, hey, when that happens, it's due and payable immediately. So when it was paid, it was paid at maturity. There's really no debate about that. That's how the indenture works, and that's what courts in advance of the negotiation of this indenture had consistently held. There isn't a court anywhere that we can find, and it certainly hasn't been cited by the note holders here, where a bankruptcy court lifted the stay or concluded the stay didn't apply, solvent or insolvent better, under any circumstances to permit creditors to decelerate debt at their option because of a private agreement in bankruptcy to increase their claim. So, I mean, the court concluded here that if it was outside bankruptcy, they clearly had the right under state law. If this debt, if there had been no bankruptcy filing, 602 wouldn't apply. We wouldn't be standing here. The automatic acceleration that made the notes due and payable immediately cannot occur outside of bankruptcy filing. That's why the notion that what would have happened outside of bankruptcy is a red herring. It doesn't really drive the decision. The parties negotiated for a different result outside of bankruptcy. Could you realistically write an indenture in such a way that you could guarantee a make-or-payment in the event of a bankruptcy? Yes, you can, Your Honor. And how would that be? Well, there's case law that has said exactly how you do it. I mentioned the In Re Anchor Resolution Corporation decision out of the bankruptcy court in Delaware back in 1998 where that's exactly what happened. I mentioned the Calpine decision in the bankruptcy court in the Southern District, which referred to debt instruments that did exactly that. The Solution decision in the bankruptcy court in the Southern District of New York back in 2007, three years before the parties negotiated this indenture, said, it is possible to provide contractually for post-acceleration yield maintenance of some sort. None of these clauses have the explicitness that would be expected in a typical post-acceleration yield maintenance clause. Those all deal with what is the current equivalent of Section 6.02, correct? Yes, sir. But not 3.07. Right. They're looking at what the courts have said, the most relevant clause when you're in a bankruptcy setting and the indenture embodies a prior agreement by the parties, eyes wide open. This is the law before they negotiated this. Final question. The first prong that was decided by the court assumes or deems the debtor to be solvent. Yes, sir. Any differences between solvency or insolvency in terms of how you resolve this? No, sir. There is no presumption in the law. There is no case that holds that the automatic stay imposed by 362 under the code doesn't apply in solvent debtor cases. And there is no case where relief has been given that is a claim or damages simply because the debtor is solvent. So in the case of a completely solvent debtor, the 431 million savings would go to the equity as opposed to the secured credit? Yes, sir, it would in that presumption. And what Judge Sanchi did here in the bankruptcy court is conduct a lengthy evidentiary hearing that permitted the note holders to put on all the evidence they wanted about the impact of that decision, whether or not to lift the stay on the note holders as well as on the debtor, and found that as I think the totality of the circumstances test that this circuit has imposed shows that it works because it puts in the hands of the discretion of the bankruptcy judge in the given case. And this is a unique case because the equity holder we're talking about here is Energy Future Holdings, the parent company that was going through a jointly administered bankruptcy. And the bankruptcy court found that if you drain not only the $431 million of this make whole claim, but another 400 some odd million from the second make whole claim. And then the argument becomes somehow is this through the back door or side door,  Yes, and there is no even whiff of a substantive consolidation in form or substance here. There's no applicability here. What the bankruptcy court was doing, and it's very clear in his opinion, what he's doing is looking at this evidence, and there was no contradictory evidence. There's none in the records, none cited or referred to, is observing that if this kind of value comes out of the parent company, it greatly prejudices the ability of this debtor, EFIH, to get out of bankruptcy. And why is that so? That sounds like through the side door. The reason is, one of the principal reasons is, that there are cross holdings, same creditors with significant holdings. Are you sure you want us to decide that issue? No, I don't think you need to. I don't think you need to decide the issue at all, Your Honor, because I believe the indenture and the construction of the indenture, the agreement the parties reached about what happens if there's a bankruptcy filing, concludes the case. No claim arose here, because they agreed the notes without taking, why would the indenture in 602 say without further action or notice? Because there's another provision that you can redeem under in another settlement. Is there one that you want to sum up then? Well, Your Honor, that would be my summary to your question, which is you don't need to get into all of the fallback arguments that try to preserve a claim here. When there was an agreement in advance, what did these sophisticated negotiators know? They knew what Northwestern Mutual said. They knew what the Solution Court said, and what Judge Liflin said in the Southern District of New York, and they agreed. They should have known what MML said, right? Yes, but that does not affect the outcome of this case in our judgment. Thank you very much. Thank you, Your Honor. Mr. Amber? Are you the only one that's going to be doing a little? I believe I am. Okay, thank you. Thank you. Thank you for your time, Judge Amber. Judge Amber, I want to start where you framed it, because I think it's the right way to ask the question. The highest court in New York, the New York Court of Appeals and NML, held the following, and I quote, While it is understood that acceleration advances the maturity date of a debt, we are unaware of any rule of New York law declaring that other terms of the contract not necessarily impacted by acceleration automatically cease to be enforceable after acceleration. So you then go from 6.02 to 3.07, and 3.07 is enforceable on its terms. How does that depart, however, from the provisions of Northwestern that have been cited and used here? I mean, how is that in any way inconsistent with the clear statement? Let me just finish my sentence. How is that inconsistent with the proposition that there needs to be a clear statement? I think Northwestern has to be understood in its facts, Judge Smith. First, Northwestern is a lower court. Second, it predates NML. But let me now get to the facts. It's a case where the lender, it's not even bankruptcy, a lender outside bankruptcy seeks to foreclose. I acknowledge that 3.07, even though it's a heading, and the indenture says headings don't count, uses the word may. I agree that if note holders force the debtor to pay by seeking to foreclose outside bankruptcy, demanding early payment, the courts have held that's inconsistent with them saying I'm entitled to a make whole. You can't have your cake and eat it too. You can't say I demand to be paid early, but you need to pay me a premium because I didn't want to be paid early. So that's a case about foreclosure, and it's a case where the language was prepayment, not redemption. And that's what's so critical here. We did not demand repayment. We did the antithesis of demanding repayment. The contract uses the term redemption, which includes a payment at maturity, and you're right with Chesapeake and Felon and all the other authorities, and it specified it and underscored it by saying redemption before a date on the Gregorian calendar, December 1, 2015. Let me just touch real quickly on a couple of cases. I urge this court to look at Calpine, the bankruptcy court in Premier Biloxi. Those were what we call no-call cases. They were payments not in a period in time in the indenture where if you redeem, you have to pay a premium, so you can't do it. But what is the it you couldn't do? Redeem. That's the word in the indenture in Calpine. That's the word in Premier Biloxi. And they're heading optional redemption, and they have the very same identical acceleration provision as this one. And what the courts held in both of those cases in awarding damages was the payment being made by the debtor after acceleration in bankruptcy at his choice, because it could have done the opposite given 11-24, is an optional redemption. That holding translated to our case where the consequence of an optional redemption is the payment of a make-call is we get the make-call. One last point. Solution. Facts matter. Solution was a case in which there was no make-call provision and no no-call provision. The only issue in that case was that the lenders had an acceleration provision, and they were saying, but you're paying me now. That's before the stated maturity. And Judge Beatty, the bankruptcy judge, said, well, wait a second. You waive the rule of perfect tender. But it's a case that has nothing to do with make-call, nothing to do with no-call, which gets me to your point, Judge Ambrose. Why is 6.02 not controlling? Because it's not the default that caused the payment. As Mr. McGann acknowledged, if they had the option under 11-24 not to pay us, and had they done so, we'd be entitled to the make-call. They made an election. And the section of this indenture that addresses what happens if they make an election is 3.07. And if there were any doubt about it, surely when the same indenture says we can rescind acceleration and we sought to do it, that makes this voluntary. You said that if they chose not to pay you, you would have been entitled to the make-call? No, I'm sorry. If I said that, Judge, I'm sorry. I think that's what you said. Okay. I want to correct the record. I misspoke. What I was trying to say was I thought Mr. McGann said, if we initially elected, we being the debtor, to exercise our right under 11-24 to reinstate, but after doing that, we then redeemed the notes. That would trigger the make-call. And that's right. If they exercised that right under 11-24, but before December 1, they'd do acceleration. Right. And my point is I think that's a concession on his part, just like the 8K is a concession, which is they had the option. And it's not that they had an option, but to use their word, and the option was to redeem the very verb that is in our indenture. Thank you very much. Thank you to all counsel for well-presented arguments, and we'll take it under advisement. I would ask counsel also in this case if you would get together with the clerk's office and have a transcript of this oral argument prepared. Thank you, everyone, for being here.